ELLIS, Judge.
Plaintiff’s insured was operating a crane during unloading operations on a railroad spur located.at or near Burnside, Louisiana, on or about July 23, 1957. While the plaintiff was unloading extremely heavy boiler plates from a gondola car spotted on a track to the west of the main line, directly across from the station depot, the crane and the boiler plate extended so as to partially block locomotive travel on the main track. While the boiler plate and crane were blocking the main track, a freight train of the defendant was approaching from the south and rounded a curve approximately one-half mile away from the station. Some 500 yards north of the depot a railroad employee was supervising railroad operations and upon hearing the train whistle he ran and obtained a flare to warn the oncoming train of the partial obstruction of the main track. When approximately one-half mile from the station, the train men noticed the *922 employee running toward them trying to get a fusee lighted, and the train was put into an emergency stop going at the speed of between 35 and 40 miles per hour. Before the train could come to a stop it struck the crane causing the damages for which plaintiff, as subrogee, has filed this suit.
Defendant answered denying negligence and alternatively plead contributory negligence and reconvened for damages to its locomotive.
The case was tried and there was judgment for the plaintiff from which the defendant has appealed.
The main argument as to error committed by the lower court is summed up in defendant’s brief as follows:
“And so Strickland, the foreman in charge who admitted he was responsible for the unloading operations and anything that occurred neither notified the Railroad Company that the main line would be blocked or take (sic) the precaution of putting out a guard or flagman for the protection of the work and the workmen being exposed to a danger while the unloading was being done. He and Hay disregarded the ordinary rules of protection to that for which they were responsible and negligently, recklessly and carelessly conducted the operations and they and their principals were responsible for the consequences of their own faults.”
The above contention of error in the judgment of the Lower Court is based upon the testimony of the station agent that she told the foreman of the unloading crew that the freight train would be through “about 8:30” and also asked them if they were going to block the main line and the answer was “No.” Further, that the negligence of the crew was responsible for the delay caused by the piece of steel of the boiler plate side wall catching on a little piece of iron in the gondola car and hanging the plate with a part extending out and over the main track, and that the crew took no precaution to protect themselves from the oncoming freight by assigning one of their crew members as a flagman or watchman 500 feet south in the direction from which the train was expected to approach.
There is a dispute in the testimony as to whether the agent stated “about 8:30” or whether she told Elgie Hay that the train was coming through “at 8:30”. We are of the opinion that it is immaterial whether she said “about 8:30” or “8:30”, for this was the regular unloading area that had been used on five other occasions for heavy machinery of the same kind and which of necessity had to block the main track for a short time. On each of the previous occasions the person in charge of the unloading or a member of the crew would first inquire of the station agent as to the time trains would be expected. They had wished to unload this particular piece of machinery the afternoon before and had asked the agent of the railroad company the expected time of the next train, and she was unable to give them definite information so they merely set up the necessary equipment for unloading and put it off until the next morning when the accident occurred. They knew they had to block the main line temporarily in order to unload the machinery and that was the very purpose of inquiring of the agent as to the arrival of trains. In the unloading operation on the day of the accident it is true that there was a delay due to the hanging of the plate. It is shown that on each occasion when it was necessary to unload machinery the station agent had been first asked when the next train would be expected before any move was made to unload the car. The agent would use the means at her command and for that purpose in the railroad station to find out when the next train would be through Burnside. She did exactly that on the morning the crew arrived to unload this particular piece of machinery from *923 the gondola car. This was at least an hour before she said the train would be definitely due, or, even if we should accept "about 8:30” the agent was in the station with a clear view of the operations and under a duty to keep in touch with the progress of this train, and all the more so if the time of its arrival was not positive. Apparently, the agent of the defendant ■did nothing until the train began to blow, although she could see the progress that was being made with the unloading and the fact that part of it extended over the main track as it did on every other occasion for a short time during the unloading of this particular kind of machinery.
We believe that the precaution of putting out a guard or flagman for the protection of the work and workmen was upon the railroad company as the station agent could locate the train by means of her intercommunication system. It is almost a matter of judicial knowledge that agents at various stations along the railroad systems can definitely keep up with the location of moving trains.
Neither do We find any proof of negligence on the part of the unloading crew which caused the machinery to become temporarily fastened, but which could not be unloosed in the face of the approaching train.
We are convinced, after a careful consideration of the record, that the judgment of the lower court is correct and that the written reasons of the District Judge correctly state the facts, the legal relationship between the parties and the law applicable thereto, and the conclusion that the defendant had not fulfilled the duty owed to the plaintiff of "reasonable and ordinary care” and that the plaintiffs were not guilty of contributory negligence. We therefore adopt the following portion of the written reasons of the trial judge which are decisive of the issues in this case as our own and we quote:
“This is a suit in tort for damages arising out of a collision between a freight train and a power crane and boom which occurred on July 23, 1957, at Burnside, Louisiana. The Hartford Fire Insurance Company, as subrogee of Y. L. Power and Son, a partnership, seeks to recover of the Illinois Central Railroad Company the sum of Two Thousand Seven Hundred Fifty Eight and 97/100 ($2758.97) Dollars paid by it to its assured as owner of the power crane. The Illinois Central Railroad denies liability and reconvenes against the plaintiff for the sum of Four Hundred Eighteen and 03/100 ($418.03) Dollars for damages to its freight engine incurred in the collision.
“The Illinois Central Railroad Company transported and delivered to its Burnside Station a large boiler plate loaded lengthwise in an open gondola car. This plate measured twenty-two (22) feet in length and weighed about twelve (12) tons. It was to be unloaded by Combustion Engineers, Inc. by means of a power crane leased from Y. L. Power and Son. The record is not clear as to whether Combustion Engineers, Inc. or Y. L. Power and Son was the designated consignee of this shipment. However, this is unimportant because no contention is made that the employees of Combustion Engineers, Inc. were not authorized to receive and unload the shipment.
“At Burnside, the main line of the Illinois Central Railroad runs approximately north towards Baton Rouge and south towards New Orleans. The station depot is on the east of this line and a parallel spur is on the west. When the car arrived at Burnside on or about July 20, 1957, it was switched onto the spur or side track parallel and adjacent to the main line across from the opposite the station depot.
“On the afternoon of July 22, the employees of Combustion Engineers Inc. under the supervision of Mr. John C. Strickland and Mr. Elgie Hay, placed the power hoist parallel to and west of the gondola. Opposite and west of the crane was placed a lowboy truck which was to receive the *924 shipment. Work was then discontinued until the following morning when the actual unloading was to take place. The next morning, July 23, Mr. Hay and his crew were ready to proceed with the actual unloading. It was estimated that this operation would take less than an hour’s time. The crew was supposed to report for work at seven A.M. It took them fifteen or twenty minutes to get where the loaded gondola car and crane were spotted. They were ready to start work between 7:15 and 7:30. Before commencing the work, Mr. Hay checked with the station agent, Mrs. Nancy Cantrell, to see what time the morning freight train would go through on the main line. Mrs. Cantrell phoned and asked the Dispatcher at Vicksburg and repeated to Hay what she had been told.' Mrs. Cantrell testified that she told Mr. Hay ‘about 8:30.’ Mr. Hay testified that he was told, ‘8:30’. Mrs. Cantrell further asked Mr. Hay if he intended to block the main line and his reply to her was that he would not.
“After checking with the station agent, the crew commenced the unloading operations. The boiler plate was long and heavy and could not be lifted straight up and out of the gondola. Several hook-ups had to be made on it before it could be lifted out of the car and then it was lifted and placed on the top of the car cross-wise in such a manner that a portion of it and the boom extended over the main line track. Another hook-up was then made to lift the plate off the gondola. However, a portion of the boiler plate caught on a piece of iron in the gondola car. One of the crew was sent into the car to try to pry it loose but before he could do so a freight train of the defendant approached from the south and struck the plate and boom of the power crane extending over the main line. Fortunately, the crew was able to get out of the way before the collision and thus escaped injury.
“The testimony is uncontradicted that the accident happened at 8:13 A.M. The freight train in question was a through freight with two diesel units, thirty eight loaded and sixty-eight empty cars. According to its time table, this freight was supposed to be in Burnside at 5:03 A.M. However, on this morning, it did not leave New Orleans until 5:55 A.M. It had a clear line to Baton Rouge since the passenger train it ordinarily met had already arrived in New Orleans.
“The train was being operated by Mr.. John H. Frazier under orders from the-Dispatcher at Vicksburg. As he approached Burnside, he was running at a speed of 40 miles per hour. The day was clear and the sun was shining. The engineer-testified that as he approached Burnside and knowing that there were a lot of people working and machinery about the track, he was blowing his whistle a little-more than ordinarily but that everything looked clear. As he came around a curve and hit the straight track into Burnside, he saw a man striking a fusee to flag him down. He immediately put the entire train in emergency because he could see there was activity going on at the siding and' it looked as if there might be something fouling the main line although of this he was not certain. He testified that he-commenced braking his train when he was-approximately one-half mile from the point of impact and that he made a good stop although the train went two diesel units- and two cars beyond the point of impact.
“Mrs. Cantrell, the station agent, testified that she was working at her desk with her back to the window when she heard the train blowing between 8:00 and 8:15. Upon looking out of the window she saw the obstruction over the main line so she ran out and saw the section foreman running down the track calling to her to-hand him a fusee. She gave him a fusee and both she and the section foreman called to the workmen to clear the track.
“Mr. A. J. Elfert testified that he was-the section foreman for the Illinois Central Railroad and that he was working about *925 five hundred feet north of the depot when he heard the train blowing and seeing that the men unloading the gondola were blocking the main line, began running south towards the depot to get a fusee to flag the approaching train. In spite of his efforts the accident occurred.
“The plaintiff contends that the accident resulted from the negligence on the part of the agents and employees of Illinois Central Railroad Company in the following respects:
“A. Giving false information to the operators of the crane when they know or should have known that such false information could result in a collision.
“B. Failing to take precaution to protect the property of the assured when it knows or should have known that it was upon the premises by implied invitation of the defendant.
“C. In failing to ascertain the correctness as to the time of its train when it knew or should have known that such a failure could result in property damage.
“D. In operating the train without heeding prior warning signals and failing to maintain a proper look-out.
“The defendant denies any negligence on the part of its agents or employees and avers that the accident was caused solely by the negligence of Y. L. Power and Son and its agents and employees as will be shown upon the trial of the cause.
“The defendant further and specially pleaded:
“A. That if any act of ommission or commission of its agents or employees contributed to the collision, the plaintiff or its agents or employees were guilty of contributory negligence which bars recovery.
“B. That plaintiff had the last clear chance to avoid the collision and resulting damages.
“C. That the plaintiff assumed the risk of unloading the car the time and in the manner so performed, the said assumption of risk being a bar to any recovery.
“In order to fix the legal responsibility for the damages arising out of this collision, it becomes necessary to determine the relationship existing between Y. L. Power and Son and the railroad company. The defendant in its brief implies that the shipment was transported for and delivered to Combustion Engineers, Inc. who were the lessees of the crane owned by Y. L. Power and Son.
“Regardless of who was the actual consignee, and thus the contractee with the railroad company, it is our opinion that under the jurisprudence with reference to unloading of railway shipments, the Courts uniformity hold that the agents or employees of the person authorized to unload the shipment with the acquiescence of the railroad company are classified as ‘invitees’. The rule is stated in the case of Gosey v. Kansas City Railroad Company [La. App.] 100 So.2d 311 at page 316 as follows:
“ ‘Plaintiff was, at least, an invitee of defendant. The car which he was engaged in loading was placed on the track for that purpose under a contract, or an agreement, between his employer and defendant. Such contract necessarily included, at least by implication, the consent that laborers enter defendant’s railroad yards and its car or cars for the purpose of loading materials to be shipped. An invitee is a person who goes on the premises of another in answer to an expressed or implied invitation of the owner or occupant on the business of the owner or occupant or for their mutual advantage. (65 C.J.S. Negligence [§] *926 43(1) p. 508), and the owner occupant or person in charge of property owes to an invitee or business visitor the duty of exercising reasonable or ordinary care for his safety commensurate with the particular circumstances involved, and is liable for injury resulting from breach of such duty, although no element of lawlessness or wantonness enters into the act of omission complained of. 65 C.J.S. Negligence [§] 45, p. 521 (italics ours.)’
“Thus it appears that any person authorized to unload a shipment with the acquiescence of the railroad company becomes a consequential invitee to whom a particular standard of care is owed by the company. There seems to be no reason why the same degree of care should not be applied towards the property of the invitee employed in the unloading operations.
“We are not unmindful of the case of Alexander v. General Accident Fire and Life Assurance Corporation [La.App.] 98 So.2d 730, wherein the Court of Appeeal for the 1st Circuit advocates abolishing the distinction between invitee and licensee and proposes measuring the duty by the nature and purpose of the visit. The Court was concerned with the difficulty which exists in classifying the status of the social visitor. We believe that applying the new rule advocated in that case would lead us to the same result as applying the definition used in the Alexander case. Until the distinction between invitee and licensee is directly adjudged and abolished, we will apply the existing invitee rule, particularly in this case where there appears to be unanimity of opinion as to the status of persons engaged in loading or unloading railway shipments.
“The duty owed the invitee is that of reasonable and ordinary care which includes the prior discovery of reasonably discoverable conditions of the premises that may be unreasonably dangerous and correction thereof or a warning to the invitee of the danger. Alexander vs. General [Accident] Fire and Life Assurance Corporation [La.App.] 98 So.2d 730, pg. 732, and cases cited thereunder. This rule may be more simply expressed as a duty to furnish a reasonably safe place in which to conduct the operations and to warn against reasonably foreseeable dangers. In fact, in the case of Sorey v. Yazoo [&] M.V.R. Company [17 La.App. 538] 136 So. 155 the Court indicates that the invitee or licensee is owed the duty of ‘Extraordinary care’ which in its opinion means the greatest care, utmost care and highest degree of care. We feel however that this rule, if it be such, fails to give adequate standards in its general application. It does indicate however, that a railroad is under a duty to reasonably safeguard invitees upon its premises.
“Having thus determined that the plaintiff’s assured enjoyed the status of an invitee, the defendant railroad company would be under a legal duty to furnish it a reasonably safe place in which to conduct its unloading operations and would be under the further duty of giving to it and its employees adequate and effective warning of reasonably foreseeable danger, as well as being under a duty not to negligently cause injury or damage to these invitees. The evidence herein convinces us that the defendant failed in its duty to effectively warn the invitees of the impending danger and is in addition chargeable with active negligence contributing to the damage to the property of the plaintiff.
“The station agent was aware the unloading operations were taking place directly in front of the station and the employee of the plaintiff had requested of her the arrival time of the next train. While this employee stated to her that he did not intend to block the main line, the very fact that he inquired concerning the train schedule indicated that there was a reasonable possibility and probability that the work could obstruct the line. We believe that the sta *927 tion agent should have been aware of this reasonable contingency and should have been prepared to give effective warning. Further the train in question was operating on an irregular schedule and the arrival time should have been given with more preciseness. A reasonable person when informed that a train would arrive ‘about 8:30’ would normally assume that this meant at 8:30 with two or three minutes leeway before or afterwards. Such a person would also expect that if the difference were 15 or 20 minutes greater that there would be further notification. No such further notice was given. When the danger was observed the station agent and the section foreman attempted to give notice of the impending danger. These notices were too late to be effective.
“ * * * We do not find that the plaintiff’s assured were guilty of contributory negligence. To so hold them we would have to find that the workmen were thoroughly aware of the conditions prevailing and the potential danger. The workmen were experienced and were reasonably sure that the unloading operation could be completed within an hour. They did not anticipate blocking the main line but were aware of that probability and so inquired of the train schedules. They were lulled into a feeling that everything would be secure until at least ‘about 8:30’. If this time had passed, we would then believe that they should have taken active steps to protect themselves from the impending danger. Before that time, we believe that this duty devolved upon the defendant.
“The parties have by stipulation agreed that the damage to the crane and boom amounted to the sum of Two Thousand Seven Hundred Fifty-eight and 97/100 ($2758.97) Dollars.
“For the above and foregoing reasons, it is ordered, adjudged and decreed that the reconventional demand of the Illinois Central Railroad Company be and the same is hereby dismissed and that there be judgment in favor of the plaintiff, Hartford Fire Insurance Company, and against the defendant, Illinois Central Railroad Company in the amount of Two Thousand and Seven Hundred Fifty-eight and 97/100 ($2758.97) Dollars, together with legal interest from date of judicial demand and for all cost of this suit.”
Affirmed.